The Commonwealth Finance Company is a partnership composed of Leslie J. Healy and Lloyd Healy and is licensed to do business in accordance with the provisions of Act No. 92 of 1928, as amended by Act No. 108 of 1940, commonly known as the Small Loan Law of Louisiana.
The said Finance Company instituted this suit against Rev. Delton Livingston for $151.02 with interest, attorneys' fees and costs, alleging that to be the unpaid balance due on a promissory note made by the said Livingston and held by it. It prayed also for recognition of its chattel mortgage, lien and privilege upon an automobile of the said defendant.
Livingston, though admitting the execution of the note, not only denied all liability, asserting that the plaintiff partnership had, in several ways, violated the provisions of the Small Loan Law and had thus made void the entire contract, but also contending that because of the nullification of the said contract he should be entitled to recover back such sums as he had paid to the plaintiff partnership on account of the said note and on account of another note which had preceded the present one.
Livingston averred that the note sued on had been executed for the purpose, in the main, of securing money to be used to pay the balance due to the same plaintiff on the said earlier note, which earlier note had, in part, represented cash loaned for the purchase of the same automobile and that both contracts involved violations of the Small Loan Law. And he averred that on the two contracts he had, in various installments, paid to the plaintiff partnership $191.50, and he prayed not only that the suit against him be dismissed but that he have judgment in reconvention for the said sum, $191.50, with legal interest on each payment from the date on which it was paid and for all costs.
There was judgment dismissing both the main and the reconventional demands but "reserving all rights to reconvenor."
Plaintiff partnership has appealed and Livingston has answered the appeal praying for judgment in reconvention as originally prayed for.
The so-called Small Loan Law, as we have said, is Act No. 92 of 1928, as amended by Act No. 108 of 1940. It provides for the licensing of those who make small loans and fixes the maximum interest rate which may be charged, prohibits the making of any other charges than those specifically set forth and establishes the terms and conditions which must be complied with by such licensees. In Section 13 it provides that "* * * Interest, discount or charges in excess of those permitted by this Act shall not be charged, contracted for or received, and, if any such shall be charged, contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest, or charges whatsoever."
It is necessary to a complete understanding of the transactions that we give the details leading up to the execution of both notes. On April 10th, 1941, Livingston agreed to buy an automobile from Community Motors. The purchase price was $275 and Livingston had only $50 in cash. The Community Motors sent him to Commonwealth Finance Company which partnership agreed to make the loan. He executed his note for $305.08, repayable in eighteen monthly installments. This sum is made up of the following items:
Cash loaned for balance of purchase price ............... $225.00 Bonus paid to Community Motors .......................... 12.50 Insurance of various kinds on automobile ................ 34.50 Recording fee ........................................... .50 Discount ................................................ 32.58 ------- $305.08
Plaintiff charges that for several reasons the contract violated the Small Loan Law. We need consider but one and that is that the charge of $12.50 for a bonus paid to Community Motors constitutes a charge "in excess of those permitted *Page 46 
by this act", and renders void the entire transaction.
It is clear from the testimony of Mr. Reynolds, manager of plaintiff partnership, that that amount, $12.50, represents a bonus paid by the Commonwealth Finance Company to Community Motors for directing Livingston to the Finance Company. No such charge is permitted by the law. It cannot in any sense nor to any degree be considered as a part of the purchase price of the automobile. Had Livingston been able to produce $275, no loan would have been necessary, and when the loan was made Community Motors was paid this $275 which was the full purchase price. It was also paid $12.50 which represented purely and simply the bonus, which the Commonwealth Finance Company was willing to pay in order to get this business.
We have not been given the figures from which we may determine whether the amount added as interest results from the charging of a greater rate than is permitted by law, and we confess that we have difficulty in following the intricate procedure which is necessary to determine the total charge for interest which may be allotted to each installment, but we do not think it necessary that this be done. The act limits not only the rate of interest but the kind and number of charges that may be made, and it does not permit any such charge as a bonus by the licensee to one who directs business to the licensee. It clearly and without ambiguity provides that "the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest, or charges whatsoever. * * *" if the lender charges "interest, discount or charges in excess of those permitted by this Act."
There has been a clear violation.
On the first note Livingston paid $115.53, and then on November 10th, 1941, requiring additional cash, he made application for a new loan and found that the balance remaining on the old note amounted to $189.55. He was granted a new loan sufficient to pay the unpaid balance, and he executed a new note for $217.78. According to the Commonwealth Finance Company this note represented the following:
Balance on old loan ..................................... $189.55 Cash on new loan ........................................ 28.23 ------- $217.78
Livingston says that he was given only $25 and that $3.23 represented a new charge not authorized by law. The new loan was to be repaid in installments of $15.33 each, which, it is admitted by plaintiff, included interest figured at the rate of 2 1/2% per month, the maximum permitted by law. Therefore, if the $3.23 was not paid to Livingston and actually represented an additional "financing" charge, this in itself constituted a violation of the law in connection with the new loan.
But we need not reach a conclusion on this question of fact because we find at least two other clear violations which, because of the statute, render this second transaction void. In the first place, the unpaid balance of $189.55 (on the old loan, some of the installments of which had not matured) included a large amount of already deducted interest and, therefore, when the new interest charge was figured at 2 1/2% per month on the entire new loan, there was plainly included in the new loan a charge of interest on interest.
But more glaring still is the fact that as each of the earlier installments fell due and was not paid promptly, interest at 2 1/2% was charged not merely on the overdue installment, but apparently on the entire loan. At any rate, the interest which was charged on each overdue installment was substantially more than 2 1/2% on that installment for the overdue period. For instance, the first installment, $15.33, should have been paid on December 10th, 1941. It was not paid until January 7th, 1942, or about 28 days after it should have been paid. When it was paid there was made against it an interest charge amounting to $10.36. The interest which had been included in this installment should have been $7.45. So that the additional amount of $2.91, charged for interest for the overdue period, was a great deal more than would be produced by charging 2 1/2% interest on the installment for the very short period of something less than thirty days. This was clearly a violation of the law. A similar course was followed when each of the other payments which were made was received by the Finance Company.
For this and for many other reasons, we conclude that on both loans there were violations of the law and that, as a result, no recovery can be had by plaintiff. *Page 47 
And this brings us to a consideration of defendant's contention that he should be permitted to recover back all amounts paid by him on account of the said notes. It is admitted that as a result of the two transactions, Livingston actually received more than $250. He contends, and it seems to be conceded, that on account of the two notes he actually repaid $191.52.
Does the fact that both transactions are now declared to be void and unenforcible entitle him to recover back the amounts which he has paid?
If, in spite of the fact that because of the provisions of the Small Loan Law the two transactions were void, there was nevertheless a natural obligation to repay any part of the two notes, then Livingston may not recover what he has paid because our Civil Code in Article 1759 (1) provides that "No suit will lie to recover what has been paid, or given in compliance with a natural obligation."
Was there any natural obligation here?
Article 1757 in paragraph (2) defines a natural obligation as follows: "A natural obligation is one which can not be enforced by action, but which is binding on the party who makes it, in conscience and according to natural justice."
We feel that though because of the law there is no legal obligation to repay any part of such notes as are involved here, there is a natural obligation imposed by conscience and natural justice to repay so much of such loans as was actually received, and, if so, then whatever may have been paid up to the amount actually received may not be recovered back.
We realize that our Supreme Court in Succession of Miller v. Manhattan Life Ins. Co., 110 La. 652, 34 So. 723, held that the four situations set forth in Article 1758 are the only ones from which a natural obligation results; that those situations set forth in that article are not merely illustrative. We are not certain that such a holding would be followed today by the Supreme Court because, as is pointed out in an article entitled "Natural Obligations", 15 Tulane Law Review 497, there are other later cases in which relationships, not included among those set forth in Article 1758, have been given effect as natural obligations. This was pointed out by the U.S. Circuit Court of Appeals for the Fifth Circuit in, In re Atkins' Estate,30 F.2d 761, in which that court held that the relationships or situations set forth in the article are merely illustrative and that others may be recognized as creating a natural obligation if they involve facts which bring them within the terms of paragraph (2) of Article 1757; that is to say, if the facts create an obligation not enforcible by legal action but binding "in conscience and according to natural justice."
But we need not rely upon our view that the Supreme Court would now hold Article 1758 to be merely illustrative because the facts here bring the situation clearly within the category of paragraph (1) of the Article, which paragraph reads as follows: "Such obligations as the law has rendered invalid for the want of certain forms or for some reason of general policy, but which are not in themselves immoral or unjust."
The law has rendered Livingston's obligations invalid "for some reason of general policy" but there is nothing about those obligations which is immoral or unjust for it is neither immoral nor unjust to feel a natural obligation to repay a loan up to the amount of cash actually received however much it may be against public policy to permit the collection of usurious interest, and however much it may be against public policy to permit the legal enforcement of any part of a usurious contract.
This first paragraph of Article 1758 means that a natural obligation exists where the original obligation from which it springs is invalid not because it is malum in se but only because the law, because of public policy, has declared it to be unenforcible.
Whether an agreement to pay usurious interest is malum in se or merely malum prohibitum has, for many years, been the subject of discussion. It was at first thought to be immoral in the extreme to exact interest at all on the loan of money, and, even after the exacting of interest was recognized as lawful, it was believed that to demand interest at too high a rate was unlawful and unjust in itself, and it was prohibited not only as being in contravention of written law but as being vicious per se. Pothier states that an agreement to pay more than the legal rate of interest produces no obligation at all, not even a natural one. See Perrillat v. Puech, 2 La. 428. But our Supreme Court in the *Page 48 
Perillat case, though recognizing that Pothier had expressed such an opinion, held that the exacting of usurious interest is merely malum prohibitum and not malum in se, and that, therefore, if usurious interest is paid, it is paid as the result of a natural obligation and may not be recovered back. We quote at length from that decision in order to show that there the court, after giving thought to the same problems which have perplexed us, held that there is a natural obligation to pay usurious interest even where the law declares that a contract to pay such interest is null.
"The 1751st article of the Louisiana Code, divides natural obligations into four kinds, and under the first head classes those `which are invalid for the want of certain forms, or for some reason of general policy, but which are not, in themselves, unnatural or unjust.'
"The 1752d declares that although natural obligations cannot be enforced by an action, yet among their effects one is, that no suit will lie to recover what has been paid, or given in compliance with a natural obligation.
* * * * *
"Were it not for the definition given to the natural obligation, in the 1751st article, we should have had great difficulty in deciding this cause. At the time this contract was entered into, the laws of Spain, in force in this State, had not been repealed. By them, contracts, beyond the legal rate of interest were void. And although one does not readily perceive any difficulty, in saying that if there was no law prohibiting taking interest at a certain rate, the promise to pay it is not only a natural obligation, but one which might be enforced in a court of justice; yet when the law has pronounced a contract null and void, it would seem that an agreement entered into in violation of it, ought not, and could not produce any effect. Pothier, who seems to have had a strong abhorrence of usury, after stating that it is prohibited by both divine and human laws, quotes the maxim of the Roman Code; Pacta quæ contra leges fiunt, nullam vim habere, indubitati juris est, and then states that an agreement to pay more than the legal rate of interest, produces no obligation, not even a natural one. Pothier, Traité du Prêt à Usage et du Précaire, No. 111.
"Under the present jurisprudence of France, the lender who pays interest which is not due, cannot compel the repayment, but some think that if the amount is beyond the legal rate, he may. Code Nap. 1906. In England money paid under usurious contracts can be recovered. Douglass' Reports.
"To return, however, to our statutory provisions, by which the case must be decided, they declare that money paid under natural obligations, cannot be recovered; and they define as natural obligations those which are not immoral or unjust, but which may be rendered invalid, from some reason of general policy.
"Under which class does the contract, to obtain more than the legal rate of interest, fall? Were we to follow the opinions of Pothier, it would be stamped with turpitude of the grossest kind; but since he wrote we believe different views on this subject pervade the civilized world. Many think that not only it is not immoral to take as high a rate of interest as the lender can obtain, but that it is impolitic to prevent him doing so. Others think differently. But we believe that those who desire to repress the practice are moved more by views of public policy, than a belief that the obligation has no force as a natural one. Indeed the prohibition of the contract by name is an expression of the legislative understanding, that, without such prohibition, it would be binding. Were it one immoral in itself, it would have fallen under the general declaration that contracts contrary to bonos mores are void; and special legislation in regard to it was unnecessary. We are of opinion that the prohibition in relation to taking more than a certain rate of interest for money, is founded upon motives of public policy, and not because the contract is immoral. In other words, that it is not malum in se, but malum prohibitum, and that, therefore, the exception must be sustained."
At the time at which this decision was rendered, contracts to pay usurious interest were completely null insofar as the interest was concerned. In Rosenda v. Zabriskie, 4 Rob. 493, the Supreme Court said: "* * * it is now the settled doctrine of this court, that any contract which stipulates for interest exceeding ten per cent per annum, is usurious and null, * * *".
Therefore, when the court held that if usurious interest is paid it may not be recovered back because it is paid as the result of a natural obligation, it so held in spite of the fact that insofar as the usurious interest was concerned the contract *Page 49 
was an absolute nullity. If a contract to pay usurious interest is an absolute nullity insofar as the usurious interest is concerned, and yet there results a natural obligation to pay, we fail to see why there was here no natural obligation to pay at least the amount which was actually received on the notes.
Though the Small Loan Law provides that if it is violated the contract is void, yet we think that for the reasons given in the Perrillat case there results a natural obligation. The Perrillat case was followed in Millaudon v. Arnaud, 4 La. 542, 544, and also in Poydras v. Lurgeau, 14 La. 34; Merchants Bank v. Gove,15 La. 378; Kenner's Syndic v. Holliday et al., 19 La. 154; Coxe v. Rowley, 12 Rob. 273; Reid v. Duncan, 1 La.Ann. 265; Hills v. Kernion, 7 Rob. 522, 529; and Cox v. McIntyre, 6 La.Ann. 470, 471.
In Rosenda v. Zabriskie, supra, it was sought to extend the view that an agreement to pay usurious interest creates a natural obligation so as to include the idea that, being a natural obligation, an agreement to pay usurious interest could form the consideration for a new contract. This argument was based on the fact that paragraph (2) of Article 1759 (then 1752) provides that "a natural obligation is a sufficient consideration for a new contract."
The court refused to so extend the doctrine of the Perrillat case saying that if an agreement to pay usurious interest effected such a natural obligation as would form the consideration for a new contract, then any usurious contract could be made binding by merely renewing it.
"The Judge is also mistaken, in supposing that a promise to pay usurious interest, is such a natural obligation as will form a good consideration for a legal contract. A natural obligation, is something binding on the party who makes it, in conscience and natural justice. Civil Code, art. 1750, No. 2. To perform a promise is a matter of conscience, and if a contract, not illicit or immoral, but to enforce which the law gives no remedy, is actually performed, the money cannot be recovered back again. This was the ground of the decision in the cases in (Perrillat v. Puech), 2 La. [428] 429, and (Millaudon v. Arnaud), 4 La. [542], 544, so much relied on by the counsel for the plaintiff; and the court has never gone further than that. But the continuance of a promise contrary in itself to law, cannot be enforced, although the parties may change the evidence of it every year. The payment of interest beyond a certain rate is, under our law, a matter of convention; and we think the doctrine has been extended far enough, in those decisions which rejected the demand to recover back usurious interest, after it had been paid. If the doctrine contended for by the counsel for the plaintiff, and sanctioned by the District Judge, were correct, a recovery could be had for any amount of usurious interest, if the contract had been reduced to writing, and then renewed."
This view seems to have been followed in Chadwick v. Menard,104 La. 38, 28 So. 933. But while in these two cases the Supreme Court refused to extend the doctrine and to hold that an agreement to pay usurious interest could form the consideration for a new contract, it nevertheless recognized the established rule that an agreement to pay usurious interest did form such a natural obligation as would prevent the recovery back of such interest as might be paid.
Mr. Fontaine Martin in his article on "Natural Obligations," supra, on page 518, discusses this question and concludes that in considering what is malum in se and what is malum prohibitum, the courts "have considerable margin." A reading of this article indicates that though the author has studied all of the cases on this subject, he cites none overruling or departing from the rule established in the Perillat case. Let us repeat then that if the Supreme Court has established the rule, that even where the law makes a contract for the payment of usurious interest null so far as the usurious interest is concerned, the payment of such interest is a natural obligation, we cannot see why here, where the law provides that the whole contract shall be void if usurious interest is charged, there should not, nevertheless, result from the original obligation a natural obligation. We find it unnecessary to go so far as to hold that there is a natural obligation to pay the usurious interest exacted here, and we limit our decision to a holding that the natural obligation which exists is based on the conscientious duty to repay at least so much as has actually been received by the borrower.
Therefore, even though there could have been no legal enforcement of the obligation which was contrary to public policy *Page 50 
the amounts paid as the result of the natural obligation cannot be recovered back, for not only does this Article 1758 so provide but we find that Article 2303, under the title "Quasi contracts," uses almost the identical language.
Article 2302 permits him who has paid through mistake, believing himself to be a debtor, to reclaim what he has paid. But Article 2303 restricts this right and provides that it exists only if "the thing paid be not due in any manner, either civilly or naturally" and that "a natural obligation to pay will be sufficient to prevent the recovery."
In a supplemental brief, counsel for plaintiff-appellant suggests, among other things, that because the original loan to Livingston was made to provide funds for the purchase of an automobile, "the Small Loan Act is not involved at all" and he bases this suggestion on a decision rendered by the Court of Appeal for the First Circuit in General Motors Acceptance Corp. v. Swain, La.App., 176 So. 636, 638. In that case the automobile had been sold by the original holder of the note, and the note which had been given for part of the purchase price had included "handling" charges. When suit was filed, one of the defenses was that the handling charges in reality constituted interest in excess of the maximum rate allowed by law. The court held, however, that the handling charge was a justifiable addition to the cash price, and, in fact, represented not interest but the difference between the cash price of the automobile and the credit price. The court said: "The amount added to the cash price to make up the credit price was not interest, and, therefore, the Small Loan Act could have no application to the case. That law applies to loans of $300 or less, and to persons, copartnerships, or corporations making loans of money, credit, goods, or things in action in said amounts. The act did not change the law relating to bona fide sales of property and the fixing of a cash and credit price for the sale of property in the usual course of business."
The same result had previously been reached in Robbins v. W.W. Page Son, 10 La.App. 207, 120 So. 683, and Mills v. Crocker, 9 La.Ann. 334. And the court cited with approval Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A.L.R. 1437, in which the Supreme Court of Alabama, according to the syllabus, had held that "`Exacting a credit price for an automobile in excess of the legal interest on the cash price is not usurious.' See Annotation in 48 A.L.R. 1442."
But those cases can afford no comfort to plaintiff here for the situation is entirely different. The automobile here had been bought by Livingston from the Community Motors and had then been mortgaged to the Commonwealth Finance Company, and the charges represented exhorbitant interest in one case and an illegal charge in another.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.